ORIGINAL

Approved: _____

18 MAG 5904

ROBERT ALLEN
Assistant United States Attorney

Before:   HONORABLE SARAH NETBURN
          United States Magistrate Judge
          Southern District of New York

U.S. DISTRICT COURT
FILED
JUL 1 1 2018
DS
S.D. OF N.Y.

- - - - - - - - - - - - - - - -   x
                                  :
UNITED STATES OF AMERICA          :
                                  :
        - v. -                    :
                                  :
JOHN GERACI,                      :
                                  :
        Defendant.                :
                                  :
- - - - - - - - - - - - - - - -   x

**SEALED COMPLAINT**

Violations of 15 U.S.C. §§
78j(b), 78ff, 80b-6, and
80b-17; 17 C.F.R.
§ 240.10b-5; 18 U.S.C. §§
371, 1349, and 2

COUNTY OF OFFENSES:
New York

SOUTHERN DISTRICT OF NEW YORK, ss.:

KURT HAFER, being duly sworn, deposes and says that he is a
Special Agent with the United States Attorney's Office for the
Southern District of New York and charges as follows:

### COUNT ONE
### (Investment Advisor Fraud)

1.    From at least in or about December 2015 through in or
about November 2016, in the Southern District of New York and
elsewhere, JOHN GERACI, the defendant, acting as an investment
adviser, willfully and knowingly used the mails and other means
and instrumentalities of interstate commerce, directly and
indirectly, (a) to employ a device, scheme, and artifice to
defraud clients and prospective clients; (b) to engage in a
transaction, practice, and course of business which operated as
a fraud and deceit upon clients and prospective clients; and (c)
to engage in an act, practice, and course of business which was
fraudulent, deceptive, and manipulative, to wit, while acting as
an investment advisor, GERACI defrauded investors by (i)
misrepresenting the performance of supposed investments in a
hedge fund; and (ii) converting investor funds to his personal
use and benefit.

(Title 15, United States Code, Sections 80b-6 and 80b-17;
and Title 18, United States Code, Section 2.)

1

## COUNT TWO
### (Securities Fraud)

2.    From at least in or about December 2015 through in or
about November 2016, in the Southern District of New York and
elsewhere, JOHN GERACI, the defendant, willfully and knowingly,
directly and indirectly, by use of the means and
instrumentalities of interstate commerce, and of the mails, used
and employed manipulative and deceptive devices and contrivances
in connection with the purchase and sale of securities, in
violation of Title 17, Code of Federal Regulations, Section
240.10b-5, by: (a) employing devices, schemes, and artifices to
defraud; (b) making untrue statements of material facts and
omitting to state material facts necessary in order to make the
statements made, in light of the circumstances under which they
were made, not misleading; and (c) engaging in acts, practices,
and courses of business which operated and would operate as a
fraud and deceit upon other persons, to wit, GERACI defrauded
investors by (i) misrepresenting the performance of supposed
investments in a hedge fund; and (ii) converting investor funds
to his personal use and benefit.

(Title 15, United States Code, Sections 78j(b) & 78ff;
Title 17, Code of Federal Regulations, Section 240.10b-5;
and Title 18, United States Code, Section 2.)

## COUNT THREE
### (Wire Fraud)

3.    From at least in or about December 2015 through in or
about November 2016, in the Southern District of New York and
elsewhere, JOHN GERACI, the defendant, willfully and knowingly,
having devised and intending to devise a scheme and artifice to
defraud, and for obtaining money and property by means of false
and fraudulent pretenses, representations, and promises,
transmitted and caused to be transmitted by means of wire,
radio, and television communication in interstate and foreign
commerce, writings, signs, signals, pictures, and sounds for the
purpose of executing such scheme and artifice, to wit, GERACI
defrauded investors by (i) misrepresenting the performance of
supposed investments in a hedge fund; and (ii) converting
investor funds to his personal use and benefit.

(Title 18, United States Code, Sections 1343 and 2.)

2

### COUNT FOUR
### (Conspiracy to Commit Securities Fraud and Wire Fraud)

4.    From at least in or about the Summer of 2015 through in or about November 2016, in the Southern District of New York and elsewhere, JOHN GERACI, the defendant, and others known and unknown, willfully and knowingly did combine, conspire, confederate, and agree together and with each other to commit offenses against the United States, to wit, securities fraud, in violation of Title 15, United States Code, Sections 78j(b) and 78ff and Title 17, Code of Federal Regulations, Section 240.10b-5; and wire fraud, in violation of Title 18, United States Code, Section 1343.

5.    It was a part and object of the conspiracy that JOHN GERACI, the defendant, and others known and unknown, willfully and knowingly, directly and indirectly, by use of the means and instrumentalities of interstate commerce, and of the mails, would and did use and employ manipulative and deceptive devices and contrivances in connection with the purchase and sale of securities, in violation of Title 17, Code of Federal Regulations, Section 240.10b-5, by: (a) employing devices, schemes and artifices to defraud; (b) making untrue statements of material facts and omitting to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) engaging in acts, practices, and courses of business which operated and would operate as a fraud and deceit upon other persons, in violation of Title 15, United States Code, Sections 78j(b) and 78ff.

6.    It was a further part and object of the conspiracy that JOHN GERACI, the defendant, and others known and unknown, willfully and knowingly, having devised and intending to devise a scheme and artifice to defraud and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, would and did transmit and cause to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, in violation of Title 18, United States Code, Section 1343.

### Overt Acts

7.    In furtherance of the conspiracy and to effect its illegal objects, JOHN GERACI, the defendant, committed the

3

following overt acts, among others, in the Southern District of
New York and elsewhere:

        a.   In or about February 2016, GERACI attempted to
solicit investments in a hedge fund by misrepresenting the
fund's performance and assets under management.

        b.   In or about April 2016, GERACI attempted to
solicit investments in a hedge fund by misrepresenting the
fund's performance and assets under management.

      (Title 18, United States Code, Section 371.)

The bases for my knowledge and the foregoing charges are,
in part, as follows:

    8.   I am currently employed as a Special Agent in the
Securities and Commodities Fraud Task Force at the United States
Attorney's Office for the Southern District of New York, and I
have been employed in this position since approximately February
2016.  Prior to that date, I was employed as a Criminal
Investigator at the United States Department of Energy's Office
of Inspector General for approximately six and a half years.
During my tenure with both offices, I have participated in
numerous investigations of financial crimes and complex frauds.

    9.   The information contained in this affidavit is based
upon my personal knowledge, as well as information obtained
during this investigation, directly or indirectly, from other
sources, including documents and information provided to me by
representatives of the U.S. Securities and Exchange Commission
(the "SEC"), documents provided by financial institutions and
solicited investors, and documents produced in response to
judicially authorized search warrants.  Because this affidavit
is prepared for the limited purpose of establishing probable
cause, I have not set forth each and every fact I have learned
in connection with this investigation.  Where communications and
events are referred to herein, moreover, they are related in
substance and in part.  Where dates, figures, and calculations
are set forth herein, they are approximate.

BACKGROUND

    10.  Based upon my review of publicly-available documents,
as well as documents provided by the SEC and other sources, I
know that, at all times relevant to this Complaint:

4

a.   JOHN GERACI, the defendant, operated a company called Meridian Asset Management ("Meridian").  In his capacity as a principal of Meridian, GERACI acted as an investment advisor to certain clients, including Victim-1 and Victim-2. Meridian maintained offices in the Cayman Islands.

b.   Multiple individuals worked for or on behalf of Meridian, including a co-conspirator not named herein who helped, among other things, solicit investments from international sources ("CC-1").

c.   Nicholas Mitsakos was the CEO and Chairman of a purported hedge fund called Matrix Capital ("Matrix").  Mitsakos was charged with various fraud offenses related to the operation of Matrix in or about August 2016.  In or about May 2017, Mitsakos pled guilty to conspiracy to commit securities fraud and wire fraud, in violation of Title 18, United States Code, Section 371.

d.   Matrix purported to be a long-short equity fund. Matrix was incorporated in the State of Delaware under the name "Matrix Capital, LLC" on or about October 4, 2013, and in the State of California under the name "Matrix Capital Markets, LLC" on or about October 7, 2013.

e.   Mitsakos and GERACI contemplated creating a joint fund that would be marketed to investors called the Meridian Matrix Long Short Fund (the "Meridian Matrix Fund").

f.   Victim-1 and Victim-2 operated a medical business ("Business-1").  As discussed in greater detail below, Victim-1 and Victim-2 invested in the Meridian Matrix Fund.

## OVERVIEW OF THE SCHEME TO DEFRAUD

11.  There is probable cause to believe that:

a.   Victim-1 and Victim-2 made an approximately $2 million investment in the Meridian Matrix Fund at the direction of JOHN GERACI, the defendant.  During the course of soliciting and managing this investment, however, GERACI (1) failed to disclose to Victim-1 and Victim-2 that GERACI had learned that Mitsakos had lied about Matrix's (and thereby the Meridian Matrix Fund's) past performance and assets under management, among other things; (2) made material misrepresentations to Victim-1 and Victim-2 regarding the value of their investment; and (3) misappropriated significant portions of Victim-1 and Victim-2's investment.

5

b.    GERACI and CC-1 attempted to solicit additional investments in the Meridian Matrix Fund from additional investors despite knowing that (1) Mitsakos had lied about Matrix's (and thereby the Meridian Matrix Fund's) past performance and assets under management, among other things; and (2) Mitsakos had misappropriated money from the purported Meridian Matrix Fund.

### MITSAKOS SOLICITS INVESTMENTS IN MATRIX CAPITAL BY MISREPRESENTING IS ASSETS UNDER MANAGEMENT AND PERFORMANCE

12.    Based on my participation in this investigation and my review of Mitsakos's plea allocution, I have learned the following, in substance and in part:

a.    Mitsakos incorporated Matrix in or about 2013. Mitsakos subsequently marketed Matrix as having achieved extremely high rates of return between 2012 and 2015.    In or about January 2015, for example, Mitsakos sent a newsletter to multiple individuals stating that Matrix had achieved annual returns of 25.4% in 2012, 66.3% in 2013, and 19.4% in 2014.

b.    Despite representations by Mitsakos to the contrary, Matrix was not capitalized during the periods referenced above and maintained only a hypothetical portfolio of investments.    In his plea allocution, Mitsakos stated, in part:

> Beginning in approximately 2014, I and others knowingly made false and misleading statements in Matrix's promotional literature and in communications with potential investors in Matrix. For example, I disseminated a newsletter that depicted Matrix historical trading performance. The newsletter did not disclose that the portfolio was a model portfolio, and, therefore, it was not based on actual trades.

> I also did not disclose to several potential investors that Matrix had not done any trading.    I am sure that this left the misimpression to some prospective investors that Matrix was an active hedge fund that was managing money, when, in reality, it had not made any trades and had not yet conducted any business.

c.    In addition to misrepresenting Matrix's assets under management, Mitsakos also retroactively manipulated even the hypothetical portfolio he maintained in order to increase

6

improperly Matrix's supposed returns and make it seem as if
Matrix was far more profitable than its hypothetical portfolio
actually had been.  Mitsakos stated the following, in part,
during his plea allocution:

> In 2014, one my colleagues in launching Matrix and I
> made revisions to the model portfolio. . . . The
> revisions that we made to the model portfolio
> increased the trading gains and therefore reported
> historical performance.  In our newsletters we
> displayed this model portfolio that incorporated the
> revisions, but the newsletter never disclosed that the
> portfolio had been revised.  The historical
> performance of the Matrix portfolio therefore was
> misleading.

## GERACI FAILS TO CONDUCT MEANINGFUL DILIGENCE ON THE MATRIX FUND

13.  There is probable cause to believe that JOHN GERACI,
the defendant, failed to conduct meaningful due diligence on
Matrix and its purported investment returns.  Based on my
conversations with GERACI and my review of emails, I have
learned the following, in substance and in part:

a.  GERACI does not appear to have ever obtained
records supporting actual trading activity by Mitsakos (which,
as already discussed, would not have existed given that Matrix
did not have any assets under management).

b.  Although Mitsakos disclosed the names of certain
alleged investors to GERACI, GERACI never made any efforts to
contact those investors (who, again, had not actually invested
in Matrix given that, as discussed above, the fund did not have
any assets under management).

c.  The diligence efforts that GERACI did make
resulted in red flags that GERACI ignored.  For example, on or
about June 6, 2016, CC-1 sent an email to GERACI stating, in
part, the following:

> John[,] just went out of my lawyer and back home. . .
> . I have very little defense on my hands, because I
> knew that Matrix falsely represented the Auditor and
> admin as performance data sources on factsheet, and
> that was clear to me in autumn and also in January
> after NOVUS warned me, when [due diligence] from those

sources was requested from admin and not given because
not existing for Matrix Capital LLC.

Furthermore, to my damage, NOVUS data was NOT from
Administrator but BBG/Nick and I didn't tell that to
Investors . . . . That's all I can say and have to
wait till next meeting.  Please delete this email,
I['] m not supposed to talk about this as its in
process.

Based on my participation in this investigation, I believe that
CC-1 is admitting in this email that CC-1 knew that the
information Mitsakos had provided in connection with Matrix's
performance was inaccurate and unverified.  I also know that
"NOVUS" is an analytics provider that commonly works with hedge
funds to generate performance, risk, and other data.

### GERACI FORMS THE MERIDIAN MATRIX FUND

14.  I have interviewed JOHN GERACI, the defendant.  Based
in part on my interview of GERACI and my review of documents
collected during the course of this investigation, I have
learned the following, in substance and in part:

a.   In or about February 2015, GERACI was introduced
to Mitsakos through a mutual acquaintance.  In conversations
with GERACI, Mitsakos represented himself to be an experienced
investor and solicited investments in Matrix from GERACI.
Mitsakos also provided false information regarding Matrix and
its purported historical performance to GERACI.

b.   Shortly after meeting Mitsakos, GERACI decided to
enter into a business arrangement with Mitsakos whereby GERACI
would create and help raise money for a new hedge fund called
the Meridian Matrix Long Short Fund, the trading activity of
which would be managed by Mitsakos.

c.   In or about March 2015, GERACI and Mitsakos
signed a letter of intent whereby Meridian and Matrix agreed to
create the Meridian Matrix Fund and appoint Mitsakos as a
subadvisor to that fund.  The agreement contemplated, moreover,
that Meridian and Matrix would share management and performance
fees paid by investors, if any.  Meridian and Matrix
subsequently entered into a series of agreements outlining the
arrangement contemplated by the letter of intent.

## VICTIM-1 AND VICTIM-2 INVEST IN THE MERIDIAN MATRIX FUND

15.  Based on my review of emails and my conversations with Victim-1 and Victim-2, I have learned the following, in substance and in part:

a.   In or about the Summer of 2015, Victim-1 and Victim-2 were seeking the services of an investment advisor and were referred to JOHN GERACI, the defendant, by another individual.  Victim-1 subsequently met with GERACI, at which point GERACI told Victim-1, in substance and in part, that GERACI was the owner and managing partner of Meridian; that Meridian generally only managed money for large clients; that Victim-1 and Victim-2 should invest their money in a hedge fund that Meridian had formed with Mitsakos; and that the fund had approximately $60 million in assets under management already and had achieved strong returns in the past.

b.   GERACI did not inform either Victim-1 or Victim-2 that the Meridian Matrix Fund's assets under management and returns provided were (1) attributed to the Matrix fund only, as opposed to the newly created Meridian Matrix Fund; and (2) never verified by GERACI.

c.   Victim-1 and Victim-2 subsequently agreed to invest approximately $2 million in the Meridian Matrix Fund.  To effect this investment, GERACI provided Victim-1 and Victim-2 with two documents:  (1) an engagement letter; and (2) an agreement entitled, "Master Loan and Pledge Agreement."  These agreements were signed in or about August 2015 but were backdated to January 1, 2015.  The agreements collectively provided that Victim-1 and Victim-2 would pay Meridian a $600,000 fee for investment-advisor services, payable in monthly installments of $55,000 per month; and that Victim-1 and Victim-2 would make a $1.4 million loan, payable over three years at 5% interest, to Meridian.  This loan was then collateralized by approximately $2 million worth of shares in the Meridian Matrix Fund. In reality, however, GERACI represented to Victim-1 and Victim-2 that the substance of these transaction was simply a $2 million investment in the Meridian Matrix Fund, and that the structure of the agreements was meant to create a tax write-off for Victim-1 and Victim-2's business.  GERACI further represented to Victim-1 and Victim-2 that the structure of the agreements was routine, and that the contracts were "just paper."  Neither Victim-1 nor Victim-2 engaged a lawyer to review the contracts.

          d.    On or about August 21, 2015, Victim-2 transferred approximately $2,000,000 to Meridian at GERACI's direction. Several days later, on or about August 26, 2015, Victim-2 directed approximately $60,135 to be sent to GERACI as a fee for his services.

          e.    Before and after investing in the Meridian Matrix Fund, Victim-1 and GERACI regularly communicated about the status of Victim-1 and Victim-2's investment.  For example:

          i.    On or about August 20, 2015, Victim-1 sent a text message to GERACI stating, in substance and in part, "Once I wire the funds how long will it take to be transferred to the fund your [sic] putting me in?  Market is down so much the last 2 days it might be a great entry point."

          ii.    On or about August 29, 2015, GERACI sent Victim-1 a text message stating, in substance and in part, "Fudns will [be] in on Monday . . . the fund is up 35% YTD.  I am looking for Nick [Mitsakos] to finish the year up another 12-15%."  Victim-1 replied, "That's incredible!  Sure wish I would have been at the first of this year!."

          f.    GERACI also sent Victim-1 multiple account statements and/or updates that purported to reflect the value of Victim-1 and Victim-2's investment in the Meridian Matrix Fund. For example:

          i.    On or about December 3, 2015, GERACI sent Victim-1 a "Statement of Account" dated October 31, 2015.  This statement reflected an initial investment by Victim-1 of $2 million, plus "Fund Performance" credits of approximately $119,520, resulting in a total balance of approximately $2,119,520.

          ii.    On or about December 23, 2015, GERACI sent Victim-1 a "Statement of Account" dated November 30, 2015.  This statement reflected a "Previous Balance" of approximately $2,119,520, plus "November performance" credits of approximately $86,200.90, resulting in a total balance of approximately $2,205,720.90.

          iii.    On or about January 19, 2016, GERACI sent Victim-1 a "Statement of Account" dated December 31, 2015.  This statement reflected a "Previous Balance" of approximately $2,205,720.00, plus "December performance" credits of approximately $12,210.00, resulting in a total balance of approximately $2,217,930.

iv.     On or about February 25, 2016, GERACI sent a
text message to Victim-1 stating, in substance and in part, that
the Meridian Matrix Fund was up 4% for the month.

v.     On or about March 25, 2016, GERACI sent a
text message to Victim-1 stating, "We are up about 90k for the
month."

vi.     On or about June 27, 2016, GERACI sent a
text message to Victim-1 stating, "Down 11k."  And on or about
June 29, 2016, GERACI sent a text message to Victim-1 stating,
"Up 12.7k yesterday."

vii.     On or about July 6, 2016, the following
text-message exchange occurred between GERACI and Victim-1:

> Victim-1: How did we end up for June?
>
> GERACI:   +7100
>
> Victim-1: Damn
>
> GERACI:   Had two down days in a row
>
> Victim-1: Do you know what my total amount is now
>
> GERACI:   $2,147,000 approximately

viii.     On or about July 19, 2016, GERACI sent a
text message to Victim-1 stating, "Down 25k today but up 167k
for the month."

g.     No interest payments were ever made pursuant to
the purported Master Loan and Pledge Agreement.

## GERACI'S REPRESENTATIONS AS TO THE VALUE OF VICTIM-1's INVESTMENT WERE MISLEADING

16.   There is probable cause to believe that GERACI's
representations as to the value of Victim-1 and Victim-2's
investment were misleading and false.  Based on my conversations
with Victim-1 and Victim-2, my review of documents, and my
participation in this investigation, I have learned the
following, in substance and in part:

a.     In or about December 2015, GERACI began seeking,
and receiving, partial returns of capital from Mitsakos.  These

transfers reduced the value of the Meridian Matrix Fund below
the values that GERACI represented to Victim-1 in the
communications described above.  For example, on or about
December 4, 2015, Mitsakos transferred approximately $100,000 to
Meridian at GERACI's direction; on or about January 7, 2016,
Mitsakos transferred approximately $200,000 to Meridian at
GERACI's direction; on or about January 12, 2016, Mitsakos
transferred approximately $11,769.70 to Meridian at GERACI's
direction; on or about March 21, 2016, Mitsakos transferred
approximately $200,000 to Meridian at GERACI's direction; and on
about April 19, 2016, Mitsakos transferred approximately
$100,000 to Meridian at GERACI's direction.

      b.  In or about December 2015, GERACI learned that
Mitsakos misappropriated significant amounts of Victim-1 and
Victim-2's investment but failed to inform Victim-1 or Victim-2
of the same:

      i.  After receiving Victim-1 and Victim-2's
investment, GERACI caused, on or about September 18, 2015,
approximately $1,993,500 to be wired to an account under
Mitsakos's control at an investment bank headquartered in New
York, New York ("Bank-1").

      ii.  Based on my review of bank records, I have
learned that Mitsakos transferred approximately $1.2 million of
that amount to another financial institution headquartered in
New York, New York("Fund-1"),[1] where he then traded the money –
but kept approximately $800,000 of the amount transferred by
GERACI in Mitsakos's account at Bank-1.  Between in or about
September 2015 and in or about January 2016, Mitsakos then used
portions of those remaining funds for what appear to be personal
and business expenses.  For example, approximately $32,483 was
wired to Bloomberg Financial LP; approximately $133,650 was used
to pay various financial services companies; approximately
$104,326 was used to pay credit cards; approximately $25,521 was
wired to a law firm; and approximately $256,311 was wired to
another account.  From that second account, approximately
$11,000 was used to make car payments; approximately $103,000
was used to make credit card payments; and approximately $72,000
was used to pay an individual who I believe, based on my review

---

[1] Based on my participation in this investigation, I understand
that Fund-1 was a financial institution that provided leverage
in exchange for certain fees, such that the relevant clients of
Fund-1 could make larger trades than if they were investing only
the capital they had provided.

of emails between Mitsakos and the recipient of the disbursements, to be Mitsakos's landlord.

iii.    Based on my interview of GERACI, I have learned, in substance and in part, that, in or about December 2015, GERACI learned from representatives of Bank-1 that MITSAKOS had invested only approximately $1,200,000 of the funds that GERACI had wired to Mitsakos, and had used portions of the remaining funds for personal and business expenses.  GERACI subsequently met with Mitsakos at a restaurant in New York, New York in or about December 2015.  During the meeting, Mitsakos told GERACI, in substance and in part, that Mitsakos had taken the funds as prepaid management expenses.[2]  Mitsakos also stated, in substance and in part, that he would repay GERACI by transferring his own shares of Matrix to an account associated with the Meridian Matrix Fund.  Mitsakos, however, never transferred any shares in this manner.[3]

iv.    On or about January 14, 2016, a Meridian representative sent Mitsakos an email stating, in part:

Nick, I'm not sure what you're doing or thinking, but you don't seem to be taking this seriously.  You've lied about your "fund", you've taken money that didn't belong to you and you've created a huge mess for everyone involved.  You have committed fraud and you seem to be only one who doesn't see it.

The email then continued, "John has generously offered you a way out.  I suggest you take it."  Mitsakos subsequently denied that he had committed fraud in a responding email.

v.    Despite learning that Mitsakos had misappropriated significant amounts of money, GERACI never informed Victim-1 or Victim-2 of this information, and, to the contrary, continued to send Victim-1 the account statements and updates discussed above.

---

[2] Based on my review of emails, I have also learned that, on or about January 15, 2016, Mitsakos sent an email to a representative of Meridian, in which Mitsakos stated, in part, that he "had bills due immediately, and many bills that were overdue," and that he "simply made the choice to assume that the remaining $800,000 was prepaid management fees."
[3] As already discussed, Matrix did not have any assets under management at the time other than Victim-1 and Victim-2's own investment, meaning that its shares would have had little or no value.

13

c.    GERACI learned that Matrix never had any assets
under management, and that Matrix's purported returns were
accordingly fictitious, but failed to inform Victim-1 or Victim-
2 of the same.  On or about January 6, 2016, for example, GERACI
sent Mitsakos an email stating, in part, "Nick, [your lawyer]
has told our counsel that you do not have a fund, in his words
the Matrix Fund does not exist.  What is going on here?  Do you
have a fund or not."  The email continued, "If the answer is no
what the hell have you been showing us for the last year."

17.    Based on my review of bank records, I have learned
that (1) JOHN GERACI, the defendant, received control over the
Fund-1 account where Mitsakos had been trading in or about March
2016; and (2) that the Meridian Matrix Fund's trading positions
held at Fund-1 were liquidated in or about June 1, 2016, meaning
that no trading was occurring after that date.  For example, on
or about March 18, 2016, Mitsakos executed a document entitled,
"Letter of Authorization," that, in substance and in part,
created a "tri-party" relationship with Meridian so as to
"assign[] the[] deposit funds to Meridian Asset Management."
And on or about May 31, 2016, GERACI sent an email to
representatives of Fund-1 stating, in substance and in part,
that GERACI intended to close the Fund-1 account "effective at
the close of trading today" and return "all funds in our account
. . . to Meridian Asset Management."  Nonetheless, and as
discussed above, JOHN GERACI, the defendant, never informed
Victim-1 or Victim-2 of the same, and, to the contrary,
continued to send Victim-1 certain of the account statements and
updates referenced above.

## GERACI MISAPPROPRIATES A PORTION OF VICTIM-1 AND VICTIM-2'S INVESMENT

18.    Based on my conversations with Victim-1 and Victim-2,
I have learned the following, in substance and in part:

a.    In or about September 2016, JOHN GERACI, the
defendant, told Victim-1, in substance and in part, that
Mitsakos has lost all of Victim-1's money.

b.    During the following months, GERACI told Victim-
1, in substance and in part, that GERACI would pay Victim-1 the
money that Victim-1 had lost.  GERACI, however, never provided
Victim-1 any additional money.

14

19.    There is probable cause to believe that JOHN GERACI, the defendant, misappropriated over approximately $1.1 million of Victim-1 and Victim-2's investment, and that GERACI's aforementioned claim that Mitsakos had lost their entire investment was accordingly false and misleading.

20.    Based on my conversations with Victim-1 and Victim-2, I have learned the following, in substance and in part:

a.    In or about September 2016, JOHN GERACI, the defendant, told Victim-1, in substance and in part, that Mitsakos has lost all of Victim-1's money.

b.    During the following months, GERACI told Victim-1, in substance and in part, that GERACI would pay Victim-1 the money that Victim-1 had lost.  GERACI, however, never provided Victim-1 any additional money.

21.    Based on my review of bank records and emails, I have learned the following, in substance and in part:

a.    Of the initial amount invested by Victim-1 and Victim-2, GERACI received back, from in or about November 2015 through July 2016, approximately $1,132,36.38 through distributions and through the liquidation of Mitsakos's remaining trading positions.  These funds were received by an offshore account maintained by Meridian ("Meridian-1").

b.    None of this amount was returned to Victim-1 or Victim-2.  Instead, between in or about November 2015 and November 2016, GERACI spent significant portions of these funds on business and personal expenses.  For example, during this approximate period, GERACI transferred approximately $320,745 from Meridian-1 to a bank account in the name of Meridian Asset Capital Ventures ("Meridian-2"), where it was used, among other things, to make car payments for a BMW, and to pay for a gym membership, gas, groceries, travel, and a cellular telephone.  GERACI also used portions of the money to pay legal fees and what appear to be expenses related to his operation of Meridian.

## GERACI'S SCHEME TO DEFRAUD OTHER INVESTORS IN THE MERIDIAN MATRIX LONG-SHORT EQUITY FUND

22.    As discussed below, there is probable cause to believe that JOHN GERACI, the defendant, and CC-1 knowingly attempted to market the Meridian Matrix Fund to other investors even after

15

GERACI learned that Mitsakos had made misrepresentations
regarding Matrix's assets under management and past returns.

23.   Based on my review of emails and other documents
collected during the course of this investigation, I have
learned the following, in substance and in part:

a.   I have reviewed emails in which JOHN GERACI, the
defendant, and/or other associates of Meridian solicited
investments for the Meridian Matrix Fund.   Certain of these
emails included representations regarding the Meridian Matrix
Fund's past performance that copied numbers provided by Mitsakos
for the Matrix Fund.   For example, on or about September 22,
2015, GERACI sent an email to a prospective investor that
included a document entitled, "Meridian Long Short Equities Fund
SP Factsheet."   This document stated, in substance and in part,
that the Meridian Matrix Fund had achieved returns of between
25.5% and 66.3% between in or about 2012 and August 2015.

b.   On or about January 20, 2016 – after GERACI had
confronted Mitsakos about Mitsakos's misappropriation of assets
from the Meridian Matrix Fund – GERACI sent an email to Mitsakos
stating, in part, "What are your intentions."   Mitsakos then
responded, in part, "I intend to pay you back completely as soon
as possible.   The best route to that will be via the fees we
receive from [additional investors].   We will get specific once
the account is funded."   Based on my participation in this
investigation, I believe that Mitsakos is telling GERACI that
Mitsakos will repay the money he had misappropriated through
advisory fees on additional funds that GERACI raised on behalf
of the Meridian Matrix Fund.

c.   I have reviewed emails in which members of
Meridian continued to solicit investments in the Meridian Matrix
Fund even after learning that Mitsakos had misappropriated
significant amounts of Victim-1 and Victim-2's investment.   For
example, on or about February 11, 2016, GERACI wrote and email
to a prospective foreign investor stating, in substance and in
part:

As discussed, I am forwarding the unique program we
have set up with Morgan Stanley which is only for non-
US clients; allows a smaller sized client to invest
with daily liquidity into a fund with superior
performance; allows the broker/advisor to be paid up
front directly from Morgan Stanley.   Have a look and
call me with any questions or comments."

16

GERACI also attached documents to the email containing purported performance numbers for the Matrix fund.  Further, on or about April 27, 2016, a Meridian associate emailed another prospective foreign investor, copying GERACI, three documents from Mitsakos containing information including a "Matrix Fund Summary Due Diligence Questionnaire."  For the reasons discussed above, there is probable cause to believe the GERACI knew by at least in or about December 2015 that the representations regarding assets under management and past performance in these documents, among other things, were false and misleading.

WHEREFORE, the deponent prays that an arrest warrant be issued for JOHN GERACI, the defendant, and that he be imprisoned or bailed as the case may be.

KURT HAFER
SPECIAL AGENT
UNITED STATES ATTORNEY'S OFFICE
SOUTHERN DISTRICT OF NEW YORK

Sworn to before me this
11th day of July, 2018

THE HONORABLE SARAH NETBURN
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF NEW YORK